UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROCHELLE V. BUMGARDNER,

                            Plaintiff,          Case # 18-CV-1446-FPG

v.                                                               DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

## INTRODUCTION

Plaintiff Rochelle V. Bumgardner brings this action pursuant to the Social Security Act seeking review of the final decision of the Commissioner of Social Security that denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act. ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c)(3).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF Nos. 8, 13. For the reasons that follow, the Commissioner's motion is DENIED, Bumgardner's motion is GRANTED, and this matter is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion.

## BACKGROUND

In September 2014, Bumgardner protectively applied for DIB and SSI with the Social Security Administration ("the SSA"). Tr.[1] 96. She alleged disability since November 2010 due to anxiety, severe pain from herniated discs in her neck, aneurysm, and high blood pressure. *Id.* In August 2017, Bumgardner and a vocational expert ("VE") testified at a hearing before

---

[1] "Tr." refers to the administrative record in this matter. ECF No. 6.

1

Administrative Law Judge Maria Herrero-Jaarsma (the "ALJ"). Tr. 48. On October 4, 2017, the ALJ issued a decision finding that Bumgardner is not disabled. Tr. 12-26. The Appeals Council denied Bumgardner's request for review in October 2018. Tr. 1. This action seeks review of the Commissioner's final decision. ECF No. 1.

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks omitted); *see also* 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

### II. Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful

2

work activity. *See* 20 C.F.R. § 404.1520(b).[2] If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, *id.* § 404.1509, the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See id.* § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

---

[2] Because the DIB and SSI regulations mirror each other, the Court only cites the DIB regulations. *See Chico v. Schweiker*, 710 F.2d 947, 948 (2d Cir. 1983).

## DISCUSSION

### I. The ALJ's Decision

The ALJ analyzed Bumgardner's claim for benefits under the process described above. At step one, the ALJ found that Bumgardner had not engaged in substantial gainful activity since the alleged onset date. Tr. 14. At step two, the ALJ found that Bumgardner has severe impairments of cervical disc herniation, migraines, major depressive disorder, generalized anxiety disorders, and posttraumatic stress disorder ("PTSD"). Tr. 15. At step three, the ALJ found that her impairments, alone or in combination, did not meet or medically equal any Listings impairment. *Id.*

Next, the ALJ determined that Bumgardner retains the RFC to perform light work[3] with additional limitations. Tr. 17. At step four, the ALJ found that Bumgardner cannot perform her past relevant work. Tr. 24. At step five, the ALJ relied on the VE's testimony and found that Bumgardner can adjust to other work that exists in significant numbers in the national economy given her RFC, age, education, and work experience. Tr. 25. Accordingly, the ALJ concluded that Bumgardner is not disabled. Tr. 26.

### II. Analysis

Bumgardner argues that the ALJ erred in analyzing her mental impairments for purposes of the RFC. Because the Court agrees, it need not reach Bumgardner's other arguments.

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Bumgardner has long complained of, and obtained treatment for, depression and anxiety. In October 2010, after successful neurosurgery, Bumgardner was prescribed Xanax for anxiety attacks with tremors. Tr. 475. During the next several months, she went to the emergency room multiple times complaining of headaches and chest pain. Tr. 484. Doctors attributed those symptoms to anxiety. *Id.*

In October 2012, she complained of depression and anxiety to her treating physician. Tr. 819-20. She was prescribed lorazepam. Tr. 816, 820. Her treating physician also "strongly" recommended that she take other medication and see a psychologist to manage her anxiety, but she declined to do so because she feared the side effects of the medication and because she had no health insurance. Tr. 813-14. Bumgardner intermittently complained of depression and anxiety over the next few years. *See* Tr. 671, 678, 684, 687, 797, 799, 800, 802, 805, 809. Those complaints increased in mid-2016 when she suffered abuse in her domestic relationship.

In February 2015, before suffering that abuse, Bumgardner received a consultative psychiatric evaluation from Janine Ippolito, Psy.D. Tr. 601. Dr. Ippolito diagnosed Bumgardner with major depressive disorder with anxious distress. She opined that Bumgardner's impairments did not cause any work limitations except that she was moderately limited in her ability to deal with stress. Tr. 604.

In March 2016, after the abuse occurred, Bumgardner began to receive mental health counseling. Tr. 707. She reported depression and anxiety resulting from the emotional, verbal, and physical abuse she suffered. *Id.* Her symptoms included severe crying episodes, moderately depressed moods, severe anxiety, and impaired concentration. Tr. 708. A licensed social worker diagnosed her with PTSD. Tr. 716. At her appointments, Bumgardner generally presented normally—her mental status examinations showed good insight and judgment, she was well

dressed, had good eye contact, and was well oriented, etc.—but she continued to report severe stress, anxiety, and depression related to her abusive relationship. *See, e.g.*, Tr. 728, 734, 737.

Erin Marinello, a licensed mental health counselor, completed mental health evaluations on three occasions while Bumgardner was receiving counseling. In the first, dated July 2016, Marinello identified Bumgardner as having PTSD, which caused her to be moderately limited in her ability to remember and understand instructions, carry instructions out, maintain attention, and interact appropriately with others. Tr. 844. Bumgardner would be very limited in her ability to make simple decisions and perform work at a consistent pace. These functional limitations increased in Marinello's second evaluation, completed about nine months later. Tr. 842. Specifically, Marinello opined that Bumgardner was now very limited in her ability to remember instructions and maintain attention. Tr. 842.

Then, in July 2017, Marinello completed a final opinion that identified even greater limitations. Marinello explained that Bumgardner's impairments were related to the dynamics of her domestic relationship—she had "very low" self-esteem, few supports, could not make goals for herself, communicate well, focus, or follow through on requests made of her. Tr. 868-71. Marinello found that Bumgardner was either seriously limited or unable to meet competitive standards with respect to most of the basic mental aptitudes necessary to perform unskilled work, like making simple work-related decisions, maintaining attention for two-segments, dealing with normal work stress, etc. Tr. 870. She also believed that Bumgardner would be absent more than four days per month due to her mental impairments. Tr. 872.

By contrast, Susan Santarpia, Ph.D., conducted a consultative psychiatric evaluation in July 2017 that indicated far milder limitations. Dr. Santarpia diagnosed Bumgardner with major depressive disorder with anxious features. Tr. 859. She opined that Bumgardner could function

6

effectively except that she was mildly impaired in regulating emotions, controlling behavior, and maintaining well-being, which Dr. Santarpia attributed to a lack of motivation. *Id.* Dr. Santarpia found these limitations consistent with psychiatric problems, but they did not "appear to be significant enough to interfere with [Bumgardner's] ability to function on a daily basis." *Id.*

At the administrative hearing, Bumgardner testified that she had constant depression that impaired her motivation and energy, daily anxiety attacks lasting one to two hours, and constant PTSD in which she relives prior abusive incidents. Tr. 66-70. She stated that her treatment consisted of cognitive behavioral therapy and anxiety medication. Tr. 70. Bumgardner believed her symptoms were getting worse over time. *Id.* She indicated that she could follow instructions, maintain concentration and attention for short periods, had no problems getting along with people or supervisors, and was able to pay bills and manage money. Tr. 73-75. But she did note that driving caused her severe anxiety and that when she gets "really anxious" she cannot concentrate or be productive. Tr. 76, 79.

The ALJ found that Bumgardner's depression, anxiety, and PTSD constituted severe impairments. Tr. 15. She concluded that Bumgardner's mental impairments caused the following functional limitations: Bumgardner could (1) only understand, remember, and apply simple instructions, (2) only work in a low-stress environment, (3) not travel to unfamiliar places, (4) only occasionally interact with supervisors, coworkers, and the public, and (5) not complete tandem job tasks requiring cooperation with coworkers. Tr. 17.

To reach this functional assessment, the ALJ largely relied on three considerations from the record. First, Bumgardner's mental status examinations have "generally been within acceptable limits." Tr. 20. Second, Bumgardner has received conservative mental-health treatment. Tr. 20-21. Third, Bumgardner's daily activities suggest a high level of functioning.

Tr. 16. For example, Bumgardner worked part-time after the onset date, managed her own money, got along with superiors, and adequately took care of her personal needs. Tr. 16, 21.

The ALJ also weighed the opinion evidence in the record. She gave partial weight to Dr. Ippolito's, Dr. Santarpia's, and Marinello's opinions, though she did not explicitly identify which portions of those opinions she found persuasive. Tr. 22-23. The ALJ found Dr. Ippolito's and Dr. Santarpia's opinions worthy of partial weight because they were "experts in their respective fields" and "performed thorough examinations" of Bumgardner. Tr. 22. But she also found their assessments overly optimistic because the "record reflects that [Bumgardner] has some limitations due to her impairments." *Id.* As for Marinello, the ALJ recognized that, although she was not an acceptable medical source, she had a longstanding treatment relationship with Bumgardner and had "expertise in counseling." Tr. 23. Nevertheless, because Bumgardner had normal mental status examinations, the ALJ found Marinello's proffered limitations "not entirely consistent with the overall record." *Id.*

Bumgardner argues that the ALJ's decision was erroneous because she did not adequately explain her rationale when she weighed the opinion evidence. The Court agrees.

An ALJ must "evaluate every medical opinion [she] receives, regardless of its source." *Pena v. Chater*, 968 F. Supp. 930, 937 (S.D.N.Y. 1997). An ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony," *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (citation omitted), and "[t]here is no absolute bar to crediting only portions of medical source opinions." *Younes v. Colvin*, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015). However, where the ALJ's "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." *Dioguardi*, 445 F. Supp. 2d at 297 (quoting S.S.R. 96-8p, 1996 WL

374184, at *7 (S.S.A. July 2, 1996)). Thus, when an ALJ adopts only portions of a medical opinion, she must explain why she rejected the remaining portions. *Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015). An ALJ must also weigh opinions from "other" sources and ensure that "the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning." *Hunt v. Comm'r of Soc. Sec.*, No. 16-CV-518, 2017 WL 1370996, at *3 n.4 (W.D.N.Y. Apr. 17, 2017).

Here, the ALJ gave partial weight to, and incorporated many stringent limitations from, Marinello's opinions. Like the ALJ, Marinello concluded that Bumgardner could not work in coordination with others, travel to unfamiliar places, or understand and carry out detailed instructions. *Compare* Tr. 17, 23, *with* Tr. 870-71. But Marinello went further and also opined that Bumgardner could not maintain attention for two-hour segments, could not deal with normal work stress, and would be absent more than four days per month. Tr. 870-72. The only explanation the ALJ provides for ignoring these greater limitations is that they were inconsistent with Bumgardner's normal mental status examinations. Tr. 23.

The Court finds this reasoning inadequate to explain why the ALJ chose to reject some, but not all, of the limitations Marinello identified. The reasons the ALJ proffered for rejecting those portions of Marinello's opinions would appear to justify rejecting the entirety of her opinions. For example, it is unclear to the Court how normal mental status examinations demonstrate that Bumgardner can maintain attention for two-hour segments while at the same time proving that she cannot travel to unfamiliar places. Normal mental status examinations would seem to support rejecting Marinello's opinions wholesale, not in part.

The same incongruity is evident in the manner the ALJ weighed Marinello's opinions in light of Bumgardner's daily activities. After discussing Bumgardner's aptitude in day-to-day

functioning, the ALJ concluded that she only had a mild limitation in her ability to understand and apply information, a mild limitation in her ability to concentrate and maintain pace, and a moderate limitation in her ability to interact with others. Tr. 16. While this might warrant rejecting Marinello's opinions *in toto*, the ALJ did not do so; instead she adopted it in part and rejected it in part.

This is not to say that the ALJ's ultimate conclusion was unreasonable. But an ALJ must provide "a sound reason for weighting portions of the same-source opinions differently." *Dowling v. Comm'r of Soc. Sec.*, No. 14-CV-786, 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015). The ALJ's decision lacks such a sound reason; her vague allusions to the mental status examinations and Bumgardner's daily activities do not reveal any consistent logic to support the highly specific limitations she adopted as compared to those she rejected. This raises the specter that the ALJ cherry picked the evidence. *See, e.g.*, *Younes*, 2015 WL 1524417, at *8. Accordingly, the proper course is to remand the case for further proceedings. *See Chmura v. Berryhill*, No. 16-CV-205, 2017 WL 1829728, at *3 (W.D.N.Y. May 8, 2017).

## CONCLUSION

For all of the reasons stated, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 13) is DENIED, and Bumgardner's Motion for Judgment on the Pleadings (ECF No. 8) is GRANTED. This matter is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: December 16, 2019
      Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court